887 A.2d 1218

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Robert Peter ZOOK, Appellant.**

Supreme Court of Pennsylvania.

Submitted Dec. 11, 2000.

Decided Nov. 28, 2005.

14

James Moreno, for Robert Peter Zook, Jr.

Karl Kenneth Brown, Susan E. Moyer, Joseph Madenspacher, Lancaster, Amy Zapp, Harrisburg, Jonelle Harter Eshbach, for Com.

Before CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, BAER, JJ.

## *OPINION*

Chief Justice CAPPY.

This is a direct appeal from the final order of the Court of Common Pleas of Lancaster County dismissing Appellant's

petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546.[1] For the reasons that follow, we affirm in part and reverse in part the order of the PCRA court and remand for a new penalty hearing.

In January of 1990, Appellant was tried before a jury and found guilty of two counts of first degree murder. The facts underlying Appellant's convictions were fully set forth in this Court's opinion on direct appeal. *See Commonwealth v. Zook*, 532 Pa. 79, 615 A.2d 1 (1992) (*Zook II* ).[2] To briefly summarize, on July 24, 1985, the bodies of Paul Conrad and Sandra Wiker were discovered in the home of Mr. Conrad. Both victims had been stabbed, bound and strangled. Shortly after the bodies were discovered, Marcellus Barnett provided police information regarding his involvement in having given Appellant the layout of Mr. Conrad's apartment and other information linking Appellant to the murders. Further, he told police the name of the motel where Appellant was staying. Appellant was later arrested as he left his motel room. At the time of his arrest, Appellant had in his possession a knife, a revolver, and two rings later identified as belonging to Paul Conrad.

Following a penalty hearing, the jury sentenced Appellant to death for both murders.[3] On June 17, 1992, this Court affirmed the judgments of sentence. *Commonwealth v. Zook*, 532 Pa. 79, 615 A.2d 1 (1992) (*Zook II* ). On March 8, 1993, the United States Supreme Court denied certiorari. *Zook v.*

1. In cases where a penalty of death has been imposed, the denial of post-conviction relief is directly reviewable by this Court. 42 Pa.C.S. § 9546(d).

2. Appellant initially was tried and convicted for these two murders in 1986. This Court, however, reversed those convictions and sentences of death and granted Appellant a new trial after determining that Appellant's statements made to police after he had invoked his *Miranda* rights improperly had been admitted into evidence. *Commonwealth v. Zook*, 520 Pa. 210, 553 A.2d 920 (1989) (*Zook I* ).

3. With respect to each murder, the jury found two aggravating circumstances, that Appellant committed a killing while in the perpetration of a felony, and that Appellant had been convicted of another murder, committed either before or at the time of the offense at issue, which it determined outweighed the one mitigating factor, that being mercy. 42 Pa.C.S. §§ 9711(d)(6); (d)(11), and (e)(8), respectively.

*Pennsylvania,* 507 U.S. 974, 113 S.Ct. 1420, 122 L.Ed.2d 789 (1993).

At trial and on direct appeal, Appellant was represented by Attorneys James Cullen and Vincent Quinn of the Office of the Public Defender, both of whom also represented Appellant at his first trial and first direct appeal.[4]

On March 24, 1995, Appellant filed a *pro se* PCRA petition.[5, 6] An evidentiary hearing was held over a period of three days in May of 1998, and two additional days in January of 1999. On November 18, 1999, the PCRA court issued an opinion and order dismissing the PCRA petition. A timely notice of appeal was filed with this Court.

Following submission of the case to our Court, but prior to the filing of Appellant's brief, Appellant filed a Motion to Remand Proceedings requesting that the matter be remanded to the trial court for a hearing regarding Appellant's competency to proceed on collateral review and competency to be executed. This Court granted that motion and directed that the PCRA court hold a competency hearing. Such a hearing ultimately was held on February 2 and 3, 2004. On May 6, 2004, the PCRA court issued an opinion concluding that

**4.** At the time of both trials, Attorney Cullen was an assistant public defender for the County of Lancaster. However, prior to the time of the PCRA hearing, he ascended to the bench of the Court of Common Pleas of Lancaster County. For purposes of this appeal, however, we will refer to Judge Cullen as Attorney Cullen.

**5.** The jurisdictional requirements of the PCRA do not apply to the instant petition since the instant petition was filed prior to the effective date of that amendment to the PCRA. *See Commonwealth v. Laird,* 555 Pa. 629, 726 A.2d 346, 351 (1999).

**6.** Robert C. Wee, Esquire initially was appointed to represent Appellant. On March 12, 1996, Mr. Wee was granted permission to withdraw, and Thelia Eaby, Esquire was appointed to represent Appellant. Ms. Eaby filed an amended PCRA petition on December 10, 1996, and a supplement thereto on July 21, 1997. Subsequently, Ms. Eaby was granted leave to withdraw and on April 13, 1998, the court appointed James Moreno, Esquire of the Center for Legal Education, Advocacy and Defense Assistance (CLEADA), as counsel for Appellant. On May 20, 1998, Mr. Moreno filed a supplemental amended PCRA petition. For purposes of clarity, the organization formerly known as CLEADA is now operating under the auspices of the Federal Court Division, Defender Association of Philadelphia.

20

Appellant is both competent to proceed with the PCRA appeal and competent to be executed. Appellant requested, and was granted, permission to challenge before this Court the PCRA court's competency determination. Since our resolution of that challenge affects our disposition of the remaining claims of Appellant, we shall address that challenge first.

 Appellant maintains that the PCRA court's conclusion that he is competent to proceed is not supported by the record and constitutes an abuse of discretion. He submits that the testimony presented at the hearing establishes that he does not trust his attorneys and believes that they are conspiring to have him executed. Appellant claims that he cannot effectively communicate with counsel any longer due to his fixed delusional belief that a radio transmitter has been inserted in his brain which monitors his every move and which can prove that he is innocent of the charges.

At the competency hearing, Dr. Robert Sadoff, M.D. and Dr. Larry Rotenberg, M.D. testified on behalf of the defense and Dr. Timothy Michals, M.D. testified on behalf of the Commonwealth. Appellant also testified.

Appellant testified regarding his belief that the Department of Corrections implanted a radio transmitter in his head that enables "them" to control his thoughts, pump conversation into Appellant's head, and project images into his field of vision. Additionally, Appellant claims that his counsel is involved in a number of illegal activities and is part of a conspiracy to defraud his family of large sums of money which initially started in 1979. Appellant testified that in 1979, there was a drug raid in counsel's law office involving members of the Pagan motorcycle gang and Appellant's mother. He claims that during this raid, a radio transmitter, similar to the one he claims is implanted in his head, was removed from his mother's abdomen "with a knife." Appellant is disturbed that his counsel will not litigate this issue of the radio transmitter. He believes that some type of technology would enable the prosecution and/or the defense to explore the actual crime scene via the radio transmitter and that, therefore, the issue

of the radio transmitter must be explored in the pending PCRA proceedings.[7] Appellant insists that he is not mentally ill and that he is innocent of the murders. He also believes that his counsel actively is seeking to have him executed.

Dr. Sadoff diagnosed Appellant as suffering from a psychotic disorder not otherwise specified with possible schizophrenia. Dr. Rotenberg diagnosed Appellant as suffering from a delusional disorder with persecutory and grandiose elements and, at times, also suffering from psychosis not otherwise specified. Both experts opined that as a result of his mental illnesses, Appellant is not competent to proceed at this time. Additionally, both believe that Appellant is not malingering. Dr. Sadoff's opinion on this point is supported by MMPI testing which indicates that he is not faking illness, whereas Dr. Rotenberg believes Appellant cannot be malingering because he has maintained the delusions for such a long period of time. Dr. Rotenberg testified that it is not uncommon for someone in Appellant's state to be very delusional yet act normal in all other respects.

Dr. Michals, on the other hand, believes Appellant is malingering and could work with his attorneys if he so chose. Dr. Michals opined that if, indeed, Appellant suffered from a psychotic disorder, he would not be able to think logically, speak clearly or function on a daily basis without some type of antipsychotic medication. He sees nothing in Appellant's behavior that would suggest that he is psychotic aside from Appellant's own "self-reports" of delusions.

Following the competency hearing, the PCRA court issued an opinion concluding that Appellant is both competent to proceed with the PCRA appeal and competent to be executed.[8]

7. Appellant also believes that a similar radio transmitter was removed from one of the murder victims during an autopsy.

8. The trial court read our remand order as implicating both the issue of competency to proceed and competency to be executed. However, the following verbatim text of our order indicates that our remand order was limited to only the issue of competency to proceed on PCRA appeal:

AND NOW, this 6th day of August, 2003, the Motion for Remand is granted. The Court of Common Pleas of Lancaster County is direct-

The issue of competency to be executed is not, however, ripe for our review; only the issue of competency to proceed is currently before this Court.[9]

In its opinion, the PCRA court noted that there is no established standard for assessing competency to proceed with a PCRA petition, but determined that it would apply a test substantially similar to the test for determining competency to stand trial which essentially looks to whether the defendant is able to understand the nature or object of the proceedings against him and to participate and assist in his defense. *See* 50 P.S. § 7402(a). The court articulated the precise standard under which it would assess this claim as being: whether Appellant understands the process and goals of PCRA proceedings and is able to assist in that process to the extent required given the specific legal and factual issues which remain to be litigated on his behalf.

The court then reviewed the relevant testimony and concluded that while it could not completely dismiss the evidence suggesting that Appellant is delusional, it nevertheless found compelling the Commonwealth's evidence that Appellant is malingering and that he is able to appropriately assist his counsel in the pending matters. The court discounted the defense experts' testimony that Appellant suffers from mental illness as being based on nothing more than Appellant's self-reported hallucinations and delusions. The court explicitly

ed to hold a competency hearing within sixty days of the date of this order. In the event the PCRA court determines that Appellant is incompetent, the parties are then directed to file a brief with this Court addressing the issue of what impact a finding of incompetency, rendered after the PCRA hearing has been held but prior to the filing of the appellate brief, has on the pending appeal. It is further directed that Appellant's brief will be due within sixty days of the PCRA court's decision. The Commonwealth's brief shall be filed within thirty days of the filing of Appellant's brief.

Mr. Justice Eakin did not participate in the consideration or decision of this matter.

Jurisdiction Retained.

9. In his brief to this court, Appellant notes that while his application for remand did, indeed, raise a claim regarding competency to be executed, that issue is not yet ripe for decision and, in any event, was not part of this court's remand order.

disagreed with counsels' claim that Appellant's delusional beliefs interfere with his ability to trust and work with his counsel. In support of that conclusion, the court noted that Appellant has not terminated his relationship with counsel despite his attempts to advance his theory regarding the transmitters; he was extremely polite and respectful to counsel during the hearing and demonstrated no hostility or animosity towards either of his counsel; and that if Appellant honestly believed that his attorneys were working to have him executed, or that they had defrauded his family in the past, he would not treat them so congenially. The court ultimately concluded that Appellant was not mentally ill and not incompetent to proceed.

Initially, we find that the PCRA court applied the appropriate standard for assessing Appellant's competency to proceed with collateral review. In *Commonwealth v. Haag*, 570 Pa. 289, 809 A.2d 271 (2002), we noted that neither this Court nor the United States Supreme Court had yet to address the issue of what level of competency is required to pursue post-conviction relief. We did not, however, explicitly state the applicable standard, discussing instead the issue of whether a defendant's incompetence is a bar to effective collateral review when a next friend has been appointed to act on behalf of the defendant due to his or her incompetence. We intimated in *Haag*, however, that the appropriate standard would be whether the defendant is able to understand the nature of the proceedings and able to communicate with and assist his counsel in the pursuit of collateral relief.[10] As noted above,

10. In *Haag*, PCRA counsel filed a PCRA petition on behalf of Randy Todd Haag (Haag) alleging, *inter alia*, that Haag was incompetent to pursue collateral relief and seeking the appointment of his mother, Naomi Haag, as next friend. Following this Court's decision in *In re Heidnik*, 554 Pa. 177, 720 A.2d 1016 (1998), the PCRA court granted Naomi Haag next friend status and ordered her to proceed. In response, Naomi Haag, moved the court to declare next friend remedies inadequate to protect Haag's right to challenge his conviction and death sentence and to stay the PCRA proceedings until Haag regained his competency. Ultimately, the court denied that motion, finding that a determination of Haag's competency to proceed with collateral review was unnecessary since a next friend had been appointed. On appeal, this Court held that when represented by a next friend and

this is the precise standard applied by the PCRA court in the instant matter. We shall now evaluate the court's ultimate conclusions regarding the competency of Appellant.

It is the burden of the defendant to establish his or her incompetence by a preponderance of the evidence. *See Commonwealth v. duPont*, 545 Pa. 564, 681 A.2d 1328 (1996). Also, the determination of a defendant's competency rests in the sound discretion of the lower court and, thus, will be disturbed on appeal only upon a showing that the court abused that discretion. *See Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003). An abuse of discretion will be found only where the lower court's determination is clearly erroneous. *See Commonwealth v. Powell*, 527 Pa. 288, 590 A.2d 1240 (1991). As noted above, the PCRA court credited the testimony of Dr. Michals that Appellant was malingering and that he could, if he chose, cooperate with his counsel. Where, as here, the experts offer conflicting opinions regarding the defendant's competency, the court is free to choose as credible only one of those opinions, provided there is support in the record for such opinion. *Commonwealth v. Appel*, 547 Pa. 171, 689 A.2d 891 (1997). And, given the sensitive nature of competency determinations, we afford great deference to the lower court's conclusions. *Id.* Accordingly, we must conclude that the PCRA court did not abuse it's discretion in determining that Appellant was competent to proceed with his PCRA appeal.[11] Thus, we shall now consider the claims of error

counsel, a prisoner's incompetence is not a bar to effective collateral review in a death penalty case. *Haag*, 809 A.2d at 278. Significantly, we noted in *Haag* that the claims asserted in Haag's PCRA petition challenging his conviction and death sentence, all of which could be classified as record-based claims, could be litigated adequately without the participation of Haag.

11. On March 15, 2005, Appellant filed with this Court an application for leave to file post-submission communication or, in the alternative, a motion to remand the competency proceedings to the PCRA court to supplement the record with newly discovered evidence. In that filing, Appellant asserts that following the PCRA court's competency determination, and following the filing of briefs in this Court, his counsel received a letter dated March 11, 2005, from Harry J. Cancelmi, Jr., an attorney with the Public Defender's Office of Greene County, informing counsel that Appellant had been ordered to undergo involuntary treat-

raised in Appellant's appeal from the PCRA court's determination to deny post-conviction relief.[12]

In order to be eligible for PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that his conviction or sentence arose from one or more of the errors listed at 42 Pa.C.S. § 9543(a)(2) and that the issues have not been previously litigated or waived. *Commonwealth v. Morales*, 549 Pa. 400, 701 A.2d 516 (1997). A claim is deemed to be previously litigated under the PCRA if the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue. 42 Pa.C.S. § 9544(a)(2). An allegation is deemed to be waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b).

ment pursuant to the Mental Health Procedures Act, 53 P.S. § 7101 *et seq.*, for a period of ninety days. The letter states that a psychiatrist for the State Correctional Institution at Greene, Dr. Asad Khan, testified at the hearing that Appellant is delusional and paranoid and that, in his opinion, a then-current hunger strike by Appellant was a result of his delusional beliefs regarding the radio transmitter and the Department of Correction's ability to monitor and control him via that transmitter. According to this letter, Dr. Khan ruled out intentional manipulation or malingering on the part of Appellant. Appellant requests that he be permitted to supplement the record in this Court, or that the matter be remanded so that he could supplement the record of the PCRA court, with the letter from Mr. Cancelmi, the transcript from the commitment hearing, and the testimony of Dr. Khan.

It is not clear from this request whether Appellant wishes to secure further testimony from Dr. Khan or simply submit his testimony from the commitment hearing. In any event, we hereby deny Appellant's request on the basis that this issue was fully explored at the competency hearing. At that hearing, Appellant presented similar evidence regarding his delusions and his alleged mental incompetency and inability to assist PCRA counsel resulting from those delusions. That evidence was, however, rejected by the PCRA court. Additionally, we note that the standard for involuntary treatment orders under the Mental Health Procedures Act is well-defined. Specifically, a prisoner may be subject to involuntary treatment when it is demonstrated that due to mental illness, the prisoner poses a clear and present danger to himself or others. *See* 50 P.S. §§ 7301, 7401.

12. Our standard for reviewing an order granting or denying post-conviction relief is limited to a determination of whether the court's conclusions are supported by the evidence and are free of legal error. *Commonwealth v. Abu–Jamal*, 574 Pa. 724, 833 A.2d 719 (2003).

26

We further note that, pursuant to *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693 (1998), the relaxed waiver rule is no longer applicable to PCRA appeals, and therefore, any claims that have been waived by Appellant are beyond the power of this Court to review under the terms of the PCRA.

Since all of Appellant's issues involve claims of ineffective assistance of counsel, the following standards will apply. The law presumes that counsel is effective and the burden of proving otherwise rests with Appellant. *Common-wealth v. Travaglia,* 541 Pa. 108, 661 A.2d 352 (1995). In order to establish a claim of ineffective assistance of counsel, Appellant must demonstrate by a preponderance of evidence that (1) the underlying claim has substantive merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) that Appellant suffered prejudice as a result of that counsel's deficient performance. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987). In reviewing counsel's stewardship, we do not employ a hindsight evaluation of the record to determine whether other alternatives were more reasonable. Rather, counsel will be deemed to be effective so long as the course chosen by counsel had some reasonable basis designed to effectuate his or her client's interests. *Id.* Also, when it is clear that the party asserting a claim of ineffectiveness has failed to meet the prejudice prong, the claim may be dismissed on that basis alone without a determination of whether the first two prongs of the ineffectiveness standard have been met. *Commonwealth v. Travaglia,* 661 A.2d at 357.

Because this is a capital case, we will address first those claims relating to the guilt phase of trial. Respecting the guilt phase, Appellant contends that trial counsel were ineffective for failing to impeach the testimony of James Walck who testified at trial concerning an alleged confession that Appellant made to him shortly after the murders while the two men were incarcerated in Lancaster County Prison. Significant to the instant claim of ineffectiveness, Walck testi-

fied that Appellant told him that he sodomized the victim, Sandra Wiker and that, after he sodomized her, he asked Sandy Nace to kill her. He testified that he and Appellant knew of each other prior to their incarceration because Walck was a friend of Sandy Nace.

Dr. Enrique Penades, the forensic pathologist who performed autopsies on both victims, testified at trial that he examined Ms. Wiker for signs of a sexual assault and found no signs of such assault. He testified that swabs taken from the victim tested negative for sperm and that neither her anus nor vagina showed signs of forcible injury. He also testified, however, that it is possible to have a sexual assault without any semen being present or without any damage to the anus. On cross-examination, defense counsel elicited testimony from Dr. Penades that, while it is possible for a sexual assault to occur without physical evidence, he had no evidence to suggest that such, indeed, occurred in the instant case and, again, that his examination revealed no signs of traumatic injury.

Appellant claims that trial counsel were ineffective in failing to present medical evidence to contradict Walck's testimony and impugn his credibility. At the PCRA hearing, counsel for Appellant presented the testimony of John Smialek, Chief Medical Examiner for the State of Maryland. Dr. Smialek testified that he reviewed the testimony of Dr. Penades and the autopsy reports prepared by him as well as the testimony of Walck. He testified that the findings and testimony of Dr. Penades are not consistent with an anal sexual battery. Appellant also points to the PCRA testimony of Marcellus Barnett, a friend of Appellant, who testified that Appellant was not the type of person that would confide in others as Walck had claimed he did. Appellant also asserts that counsel should have called FBI Agent Harold Deadman, who had testified in Appellant's 1986 trial that there was no hair or fiber evidence whatsoever linking Appellant to the apartment where the murders occurred.

Attorney Cullen testified at the PCRA hearing that the defense strategy regarding Walck was simply to demon-

strate that Walck's entire testimony was false. Indeed, the defense thoroughly cross-examined Walck regarding his veracity. For example, Walck admitted on cross-examination that prior to providing police with information implicating Appellant, he had given police information concerning Sandy Nace's involvement in these murders. He also admitted to having given information to a local police department in the past regarding another person, all in exchange for favorable treatment regarding charges pending against him. Counsel also elicited from Walck testimony that he had been charged with and/or convicted of numerous robberies, thefts and burglaries, beginning as early as 1976 when he was just a juvenile, up to and including 1985. In response to questioning of defense counsel as to why he did not obtain a medical examiner to testify to this lack of evidence in an effort to impeach Walck's testimony, Attorney Cullen stated that he saw no need because there was no physical evidence to support a sexual battery. He also noted that had they put on a defense expert to testify, similar to Dr. Penades, that there was no evidence of a sexual battery, the prosecution could easily have elicited testimony from such expert that it is possible for a sexual assault to occur without any physical evidence to that effect. In other words, the prosecution could have spun the testimony on this point, just as the defense had done regarding the testimony of Dr. Penades. Attorney Cullen explained further that he determined it was better to attack the testimony of Walck as entirely incredible given his known propensities to offer information to authorities in exchange for leniency in his own criminal matters than to attempt to discredit him on the issue of the lack of physical evidence to support an anal rape because such attempt could, as just noted, easily fail and such failure may then lend credence, in the minds of the jurors, to the remainder of Walck's testimony. Respecting the failure to call the FBI agent that had testified at Appellant's first trial, to again testify that there was no physical evidence found at the scene of the crime linking Appellant to the murders, Attorney Cullen stated that he would not call an agent of the FBI to testify because they generally work for the prosecution and, in his opinion, tend to equivocate when testifying to this

type of evidence and that, in any event, he did not need to call him since he was able to present evidence from other sources that there were no fingerprints, hair, or fibers found connecting Appellant to the apartment where the murders occurred.

The PCRA court found this strategy reasonable and, accordingly, rejected Appellant's claim. We agree with that finding. With respect to each particular claim raised here, counsel offered reasonable explanation for his actions that were credited by the PCRA court. Moreover, even assuming we were to find counsel's actions unreasonable, Appellant's claims would still fail on either the merit prong or the prejudice prong. First, counsel did thoroughly impeach the credibility of Walck at trial, albeit, with evidence other than additional medical testimony. Second, while Appellant alleges that FBI Agent Deadman should have been recalled, he fails to assert that Agent Deadman was available to testify at the 1990 trial and, in any event, fails to establish the requisite prejudice insofar as this precise evidence was presented at trial via other testimony. *See Commonwealth v. Morales*, 549 Pa. 400, 701 A.2d 516 (1997) (holding that in order to establish counsel ineffectiveness for failing to call a particular witness, the petitioner must establish (1) that the witness existed; (2) that the witness was available; (3) that counsel knew or should have known about the witness; (4) that the witness was prepared to cooperate and testify at trial; and (5) that the absence of the testimony prejudiced him). Finally, the PCRA testimony of Dr. Smialek essentially was the same information testified to by Dr. Penades at trial. Significantly, each essentially testified that there was no evidence of a sexual assault. Accordingly, Appellant's claim of ineffectiveness was properly rejected by the PCRA court.

Appellant next claims that counsel were ineffective in failing to object to the court's guilt-phase instruction which allegedly relieved the Commonwealth of its burden of proving each element of the offense beyond a reasonable doubt. Specifically, Appellant contends that the court improperly instructed the jury regarding how it was to determine whether a

particular statement made by Appellant, and admitted at trial, was voluntary. It does not appear that this issue was briefed and/or argued before the PCRA court. Accordingly, the issue had been waived. *See Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 725 (2000)(finding that issues not raised before the lower court are waived and cannot be raised for the first time on appeal).

■ Next, Appellant claims that counsel were ineffective in failing to investigate and present evidence that Paul Conrad's rings were removed from his premises prior to the homicides by someone other than Appellant. At the time of his arrest, Appellant had in his possession two rings that were allegedly stolen from Paul Conrad's house on the night of the murders. Appellant contends that the rings were a critical piece of evidence linking him to the scene of the crime and, thus, that the significance of the rings should have been of paramount importance to counsel. Appellant maintains that with minimal investigation, counsel could have learned, and presented evidence to the effect, that the rings had come into his possession prior to the murders. At the PCRA hearing, Appellant presented the testimony of Crystal VanSickle who testified that Timi Butterbaugh, a girlfriend of the victim Paul Conrad, was a drug addict who oftentimes stole items, including jewelry, from stores as well as from Mr. Conrad, which she would then pawn to support her drug habit. Ms. VanSickle also testified that Allen Ault, a friend of Appellant, was seen in possession of one of these rings the evening of the murders. Significantly, the PCRA court found this testimony to be incredible and credited the testimony of trial counsel who testified that they fully explored the issue of the rings with Appellant prior to trial and that he could not give them a reasonable explanation as to how he came to possess them. Affording the court's credibility determinations proper deference, we reject Appellant's claim of ineffectiveness as being wholly without merit. *See Commonwealth v. Farquharson* 467 Pa. 50, 354 A.2d 545 (1976) (holding that an appellate court cannot substitute its judgment for that of the finder of fact).

■ Having concluded that the guilt phase issues raised by Appellant do not entitle him to relief, we now turn to the penalty phase claims. Appellant presents several related, yet distinct, claims regarding trial counsel's alleged failure to investigate, develop and present readily available mitigating evidence. First, Appellant submits that trial counsel were ineffective in failing to present mitigating evidence at the penalty phase that Appellant suffered a serious head injury in 1982 and, at the time of the murders, was suffering from organic brain damage resulting from the 1982 head injury. In support of this claim, Appellant asserts that prior to trial, counsel had obtained various medical and/or psychological records that documented the brain injury suffered by Appellant in 1982 and also had obtained records from the Department of Corrections that documented the profound effect that particular injury had on Appellant's behavior and personality. Appellant submits that counsel failed to forward the relevant Department of Corrections records to its experts and failed to present to the jury any evidence whatsoever of Appellant's documented brain injury and resulting brain damage.

The fact that Appellant suffered a serious head injury and resulting brain damage prior to the murders is not in dispute. It also is clear that Appellant's trial counsel were in possession of records which documented this injury and resulting brain damage, yet never presented this evidence at the penalty phase.[13] The crux of the instant controversy is whether

13. Testimony from the PCRA hearing reveals that prior to trial, counsel received, via a court order, records from the Department of Corrections regarding Appellant dating back to 1981. Until presented with an actual copy of the court order, Attorney Cullen did not remember seeking a court order in 1989 to obtain these records, and did not remember whether he ever obtained these records prior to the first trial. Those records, which were admitted into evidence at the hearing, indicate that Appellant was sentenced in 1980 to three to six years of incarceration for his convictions of burglary, theft, and violation of probation. Those records further reveal that while incarcerated for those crimes, Appellant suffered a head injury on or about July 4, 1982, and underwent a craniotomy at Nesbitt Memorial Hospital. The records indicate that a drastic behavioral change was noted very soon after the accident and that Appellant developed seizures which were determined to be a result of the head injury. The records indicate that following the injury, Appellant had numerous misconducts, at least one

counsel's actions with respect to this information were reasonable or, stated another way, whether Appellant has established the performance prong of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[14]

A significant portion of the PCRA hearing focused on Appellant's organic brain damage and trial counsel's actions with respect to the records they had received which documented the injury and/or the resulting brain damage, especially those records obtained from the Department of Corrections. Regarding this issue, Appellant's trial counsel, Vincent Quinn, testified that the penalty phase presentation in the second trial was essentially the same as that presented in 1986 at the first trial and that he and Attorney Cullen discussed the matter of mitigation evidence before both trials and were concerned because they believed they had no significant evidence of mitigation. Nevertheless, each counsel recalled having known before trial that Appellant had suffered a head injury prior to the murders. Also, each recalled having

of which was rather serious. Those records include reports of periodic evaluations, each of which reference Appellant's antisocial and impulsive behavior. Those records further indicate that Appellant complained repeatedly after the injury of feeling moody, irritable and depressed and that he was unable to control his anger and desire to strike out at others. One psychiatrist's progress note indicates his belief that the head injury organically affected Appellant's ability to control his impulses. Another report, dated June 2, 1983, after documenting Appellant's "drastic behavioral change" following his head injury, indicates a need to monitor Appellant for the possibility of an organic impairment.

The records obtained from Nesbitt Memorial Hospital include information regarding Appellant's admission to the hospital following the head injury and document the surgery performed and his medical progress. Also included are records from his readmission several months later due to the development of seizures. Thus, while the hospital records documented the actual injury suffered by Appellant, it was the Department of Corrections records that documented the profound changes in Appellant's behavior and personality, and the organic brain damage that developed after the injury, but prior to the murders.

14. In *Strickland*, the Court adopted a performance and prejudice test for assessing a claim of ineffectiveness. Under the standards set forth by this Court in *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987), the arguable merit and lack of reasonable basis prongs equate to the performance prong of *Strickland*. *See e.g., Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767 (2004).

received various records, including those from the Department of Corrections prior to trial. Attorney Quinn recalled having obtained the Department of Corrections records prior to both the first and second trials. Respecting the records from the Department of Corrections, Attorney Cullen testified that he had no recollection as to when he obtained these records or what he did with them, but that he would assume that he forwarded the documents to his experts. Attorney Quinn recalls Attorney Cullen having told him that the records referenced a head injury and that Attorney Cullen would consult with Dr. Gottlieb on the matter. However, Attorney Cullen testified that he could recall no specifics discussed with either Dr. Gottlieb or Dr. John. Attorney Quinn testified at the PCRA hearing that evidence of organic brain damage, indeed, would represent significant mitigating evidence.

Dr. Jerome Gottlieb, a psychiatrist, testified at the PCRA hearing that he was contacted by the defense in 1985, prior to the initial trial. He also testified that he has no recollection of being contacted again regarding this matter. He testified that prior to the initial trial in this matter, Attorney Cullen provided him copies of Appellant's medical and/or hospital records, school records, drug and alcohol treatment records, and a report prepared by Dr. John dated January 24, 1986, but that Attorney Cullen did not provide him with a copy of the Department of Corrections records regarding Appellant. Dr. Gottlieb went on to testify that prior to the PCRA evidentiary hearing he, indeed, reviewed the relevant records from the Department of Corrections. He indicated that had he been provided those records back in 1985 or 1986, he would have recommended with more certainty that Appellant undergo some neuropsychological testing. He found particularly significant therein a report prepared by James Taylor, M.D., a consulting psychiatrist, dated October 7, 1982, which indicated that Appellant was suffering from a change in behavior consistent with post-concussion syndrome and recommended that Appellant undergo a neuropsychiatric evaluation.[15] He con-

15. Admitted into evidence at the PCRA hearing was a copy of Dr. Gottlieb's forensic psychiatric evaluation that was prepared prior to the

cluded that had the testing been performed at that time, and assuming the results were the same as those found by Dr. Armstrong, his opinion would have been that Appellant's brain injury and resulting condition would have provided the defense with mitigating evidence.

Dr. Kenneth John, the other expert hired by the defense, testified at the PCRA hearing that his initial evaluation of Appellant took place in 1986, prior to the first trial, and that he prepared a report following that evaluation. He testified that while he met once with Appellant prior to the second trial, he prepared no new report at that time. Dr. John testified that he received various records from trial counsel including drug and alcohol treatment records, school records, and hospital records. He recalled that the hospital records contained information regarding a head injury. While Dr. John could not remember specifically what, if any, recommendation he made to trial counsel regarding the reference to Appellant having suffered a head injury, he testified that it was his general practice to recommend an appropriate consultation, most likely with a neurologist.

Dr. Carol Armstrong, a neuropsychologist, testified that she conducted a neuropsychological evaluation of Appellant on May 30, 1997, the results of which indicate that Appellant suffers from organic brain damage resulting from the head injury he suffered in 1982. She testified to the significance of the brain injury and to the fact that the seriousness of this injury was well-documented in the records from the Department of Corrections.

initial trial in this matter. That evaluation was based on an examination performed on October 4, 1985, and concluded that there was no evidence of a severe psychiatric disorder that would render Appellant incompetent to stand trial. However, in that same evaluation, Dr. Gottlieb recommended that Appellant undergo psychological testing to determine Appellant's IQ and to confirm Dr. Gottlieb's impressions. He also stated that if the psychological testing suggested organicity, then a follow-up with a neurologist would have been appropriate. Dr. Gottlieb testified at the PCRA hearing that counsel never again contacted him regarding this matter and that he was never asked to testify at Appellant's trial.

Dr. Neil Blumberg, a psychiatrist and expert in the field of forensic evaluation testified that he evaluated Appellant on May 12, 1998, prior to the PCRA hearing. Dr. Blumberg testified, consistent with Dr. Armstrong, that Appellant suffers from organic brain damage as a result of the head injury he suffered in 1982. Dr. Blumberg testified that while Appellant certainly possessed an antisocial personality disorder prior to the head injury, that disorder was exacerbated by the injury. In terms of the permanency of Appellant's brain damage, Dr. Blumberg found significant the fact that Appellant was unconscious for forty-five minutes following the injury, that he developed seizures soon thereafter, and that he experienced post-traumatic amnesia following the injury. He also found significant the dramatic behavior change, especially the violent tendencies that Appellant exhibited following the injury, which change was well-documented in records of the Department of Corrections. He testified that a review of the records from the Department of Corrections reveal that those following Appellant's progress clearly recognized the profound impact the head injury had on Appellant's behavior and perception.

Dr. Gottlieb, Dr. Armstrong, and Dr. Blumberg each testified that based upon the reports provided to them, including the Department of Corrections records, and their evaluations of Appellant, that Appellant, at the time of the murders, was under the influence of extreme mental and emotional disturbance, 42 Pa.C.S. § 9711(e)(2), and that his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired, 42 Pa.C.S. § 9711(e)(3).

In addressing this claim, the PCRA court found that, indeed, Appellant suffers from organic brain damage as a result of the serious brain injury in 1982, and that such information was readily available to trial counsel, but was not presented in mitigation at the penalty phase of trial. The court nevertheless rejected Appellant's claim of ineffectiveness stating the following:

36

Because of the complexity and volume of evidence that was involved in this trial, it is not a surprise that nine years after the fact, counsel does not specifically recall sending these particular records to the retained experts. However, this is not a case of counsel ignoring evidence of petitioner's physical condition and mental state. Counsel spent a significant amount of time obtaining medical records and retaining a psychologist, Dr. Johns[sic], and a psychiatrist, Dr. Gottlieb, to evaluate them. Counsel did not have the medical expertise to evaluate their significance so he obtained experts for this purpose. While petitioner would draw the inference that since neither doctor has any record of them, this means counsel never sent them, we are unwilling to so conclude. While Dr. Gottlieb kept good records, Dr. Johns[sic] did not. While [Attorney] Cullen has no specific recollection of sending the records, he cannot imagine why, after going through the trouble of obtaining them, he did not. It is quite simply possible they were sent to both doctors, or to Dr. John but not to Dr. Gottlieb, and possible[sic] through error were not sent at all. We simply do not know; the evidence is equally compelling both ways. Since petitioner bears the burden of proof, equally compelling means he has failed to carry it. Thus, petitioner has not met the second prong of *Pierce* as trial counsel's actions regarding petitioner's medical records were reasonable and pursued in an effort to advance petitioner's best interests.

PCRA ct. op. at 5–6.

Appellant submits that not only is the court's finding that Appellant failed to establish that the relevant records were never forwarded to the defense experts without support in the record, but also that the court's legal analysis is incorrect. For the following reasons, we find merit to Appellant's claims.

As noted previously, Dr. Gottlieb testified that counsel did not provide him with a copy of the Department of Corrections records. Additionally, admitted at the PCRA hearing as part of Exhibit 16 are two cover letters, one dated October 2, 1985, the other October 7, 1985, both of which are addressed to Dr. Gottlieb under signature of Attorney Cullen, which reference

the individual records relating to Appellant that were being forwarded for Dr. Gottlieb's review. Significantly, neither of those letters make any reference to Department of Corrections records. However, even assuming, for purposes of this argument, that the court's finding is supported by the record, the court's analysis of the reasonableness of trial counsel's actions with respect to this particular mitigating evidence gives short shrift to counsel's duty respecting the investigation and preparation of mitigation evidence.

This Court recently addressed the issue of capital counsel's duty to investigate and prepare mitigation evidence in *Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767 (2004). In *Malloy*, we held that counsel's duty in this respect "encompasses pursuit of all statutory mitigators of which he is aware or reasonably should be aware, unless there is some objective, reasonable ground not to pursue the circumstance (such as when it might open the door to harmful evidence)." *Id.* at 787. We recognized that counsel's effectiveness is seriously in question where counsel either fails to realize, or realizes but fails to pursue, a course of investigation objectively dictated by the Sixth Amendment. *Id.* In support of our holding in *Malloy*, we relied in part on the recent United States Supreme Court decisions in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In *Wiggins*, counsel's investigation uncovered a psychologist's report which found that Wiggins had difficulty coping with difficult situations and had features of a personality disorder; a written presentence investigation report describing Wiggins' "misery as a youth" and observing that that he has spent a significant part of his life in foster care; and social service records documenting such placement in foster care. Counsel, however, chose not to pursue this evidence further and failed to commission a social history report, despite receiving funds for one. The Supreme Court determined that counsel's failure to pursue these leads with further investigation was objectively unreasonable, noting that such failure did not result from strategy, but rather was the result of simple inattention.

38

■■■ Similarly, here it is clear from the evidence adduced at the PCRA hearing that counsel's failure to present evidence of Appellant's organic brain damage simply was a result of inattention to the mitigating evidence that was known, or should have been known, to counsel. The PCRA court's conclusion that counsel's actions regarding the Department of Corrections records were reasonable since they sought a court order to obtain these records and hired experts to evaluate their significance rings hollow. As noted above, counsel's duty encompasses more than the mere recognition or collection of relevant documents; rather, counsel is charged with the duty to pursue all mitigating evidence of which he should reasonably be aware. *Malloy*, 856 A.2d at 787. Moreover, counsel in the instant case offered no strategic reason whatsoever for failing to pursue evidence of Appellant's brain injury and resulting organic brain damage.[16] Accordingly, we find that

16. At the penalty phase, trial counsel presented only four witnesses. Three of those witnesses, Appellant's sister, a brother, and a family friend, all testified to Appellant's caring and charitable nature except for when he was drinking. Each of those examinations was relatively brief and met with no cross-examination. The fourth witness, Dr. John, testified as to his psychiatric evaluations of Appellant, three of which occurred prior to the first trial, the fourth, just prior to the retrial. He testified that Appellant's parents were pretty much uninvolved in Appellant's upbringing; that Appellant began drinking alcohol at age thirteen; and that he had a poor academic record. He testified that the testing he performed revealed an IQ of 94 and a diagnosis of polysubstance abuser and mixed personality disorder. He testified that Appellant's disorders make it difficult for Appellant to interact with other individuals socially and interfere with his ability to be employed. He testified that Appellant is more likely to become aggressive and volatile when drinking or ingesting controlled substances, but that he could function well in a very controlled environment such as prison where there are definite rules. Diane Metzger, Appellant's sister, testified that Appellant began drinking at age thirteen and became an alcoholic like their father, but that when Appellant was not drinking, he would take his family to festivals and Dutch Wonderland, oftentimes spending his entire paycheck on them. In examining this witness, Attorney Cullen asked whether Appellant was ever injured, to which she responded that he had suffered a head injury several years back while he was incarcerated. Counsel did not, however, pursue this line of questioning. Appellant's brother, Donald Zook, also testified to Appellant's charitable nature with his family except for when he was drinking. Thus, while there is evidence in the instant matter that trial counsel did conduct some investigation into Appellant's background in preparation for the penalty hearing, it appears clear from the record that counsel did not

there is merit to this claim and that counsel's actions were not reasonable.

Having concluded that there is merit to this claim and that counsel's actions were unreasonable, we must now consider whether such failings prejudiced Appellant. *See Commonwealth v. Brown*, 582 Pa. 461, 872 A.2d 1139, 1150 (2005). Notwithstanding its conclusion that counsel's actions were reasonable, the PCRA court addressed this third prong of the ineffectiveness standard, finding that "given [Appellant's] behavior prior to 1982, the brutality of the crimes involved and the aggravating factors found by the jury, it is highly doubtful that this evidence of a head injury would have persuaded the jury to have imposed life imprisonment." PCRA ct. op. at 6. In support of that finding, the court noted that the records from the Department of Corrections indicate that prior to the head injury he suffered in 1982, Appellant displayed some of the same personality traits that he had after the injury and had also been diagnosed with an antisocial personality disorder prior to the injury. However, as noted earlier in this opinion, there was testimony presented at the PCRA hearing that the head injury suffered by Appellant greatly aggravated those personality traits and the records from the Department of Corrections document the drastic change in personality that Appellant displayed following the head injury. Moreover, the fact that Appellant's experts each testified that evidence of his injury and resulting brain damage was relevant to establishing two additional mitigating factors that were not presented at trial leads us to conclude that Appellant sufficiently established the requisite prejudice. Had the jury heard this relevant evidence, there is a reasonable probability that at least one juror would have found an additional mitigating circumstance and struck a different balance in weighing the aggravating and mitigating circumstances. *See Malloy*, 856 A.2d at 789.[17]

undertake a "reasonable" investigation as required under the Sixth Amendment.

17. Appellant also maintains that counsel failed to present evidence in mitigation that Appellant abused alcohol and methamphetamines and

Accordingly, for the reasons stated herein, we affirm the PCRA court's order denying Appellant relief on his guilt phase claims; we reverse that order with respect to the court's denial of relief on Appellant's penalty phase claims and remand the matter to the trial court for a new penalty hearing.

Justice NIGRO, Justice NEWMAN, Justice SAYLOR and BAER are with the opinion.

Justice EAKIN did not participate in the consideration or decision of this matter.

Justice CASTILLE files a concurring opinion.

Justice CASTILLE, concurring.

I join the Majority Opinion, subject to the following qualifications concerning the Majority's finding of counsel ineffectiveness in failing to present evidence of appellant's head injury and the relevance of that injury to establishing two separate and additional mitigating circumstances.

First, contrary to the suggestion by the Majority, I am not entirely convinced that there was any serious deficiency in counsel's *investigation* of mitigation evidence in this case— particularly given that the passage of time appears to have made it difficult for counsel to recall the precise circumstances and exact contours of that investigation. Counsel here *did* conduct an investigation and *did* discover the prison records which documented the head injury appellant suffered three years before he committed the two murders that were the subject of the instant prosecution. However, the PCRA court noted that the evidence was equivocal concerning whether counsel actually forwarded the records at issue to his mental health experts: the experts thought not and, while counsel

was under a drug and/or alcohol induced state at the time of the murders and that Appellant came from a dysfunctional family and that he was abused as a child. Given our holding that Appellant is entitled to a new penalty hearing due to counsel's failure to present evidence of his brain injury and resulting organic brain damage, we need not address these or any other penalty phase claims raised by Appellant.

could not specifically recall, he noted that he would have had no reason not to have forwarded the records after going to the trouble of securing them. In a circumstance such as this, where the proof made it only as likely as not that counsel failed to forward the records, I think it was eminently reasonable for the PCRA court to conclude that the party with the burden of rebutting the presumption of effectiveness failed in his proof. I would not discount so quickly, as the Majority does, the PCRA court's logical conclusion.

Accordingly, I am not convinced that this case involves a failure of investigation. But, what seems to have been proven is that counsel made nothing of the fact of the documented brain injury, its potential effect upon appellant, and its relationship to specific, potential mental health-based mitigating circumstances which were not otherwise pursued before the sentencing jury. And so, while counsel's investigation may have been diligent, it appears there was a lapse in the follow-up and in the presentation to the jury, there was no specific, reasonable explanation proffered to explain that failure, and no objective reason is otherwise apparent. For this reason, I agree that the performance prong of the *Strickland*[1] test has been satisfied.

On the question of prejudice, I recognize that this is a case where counsel presented a cogent case in mitigation, attempting to portray appellant in a positive light. In addition, I think that it is unrealistic in the extreme ever to discount the difficult uphill battle any capital defense lawyer faces where, as here, one of the aggravating circumstances involves the fact that his client elected to commit multiple first degree murders. This is a mark of distinction that seems different in kind from other statutory aggravators. Thus, if the foregone additional mitigation evidence in this case were mere catchall "I had a bad childhood" evidence, I doubt that this Court could find

1. *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (holding that to establish the performance prong of an ineffectiveness claim, a defendant must show that given the circumstances of a particular case, counsel's conduct fell outside of the "range of professionally competent assistance").

that appellant sustained his burden to prove prejudice.[2] Similarly, the mere fact that appellant suffered a head injury alone would not be a fact that would convince me that counsel was ineffective. But, here, the undisputed proof is of documented brain damage and the proffer, also apparently unrebutted, is that the evidence at least would have supported a juror in finding additional statutory mitigators. In these circumstances, I agree that prejudice has been established, and I concur in the award of a new penalty hearing.

**2.** *See Commonwealth v. Moore,* 580 Pa. 279, 860 A.2d 88, 99 (2004) (noting that evidence of traumatic childhood "may or may not be perceived as mitigating (one juror might see this as reason for sympathy; another might see it as assuring [the defendant] his violence permanently ingrained in him").